EASTERN MARINE CORPORATION, owner of the S/S EASTERN ARGO, Appellant,

v.

FUKAYA TRADING CO., S.A., Appellee.

No. 22581.

United States Court of Appeals Fifth Circuit.

July 25, 1966.

Rehearing Denied Aug. 22, 1966.

William S. Stone, New Orleans, La., Morton Zuckerman, New York City, for appellant.

Moise S. Steeg, Jr., New Orleans, La., for appellee.

Before JONES, WISDOM, and GEWIN, Circuit Judges.

WISDOM, Circuit Judge:

This case presents the question whether the arrival of a chartered vessel at the loading wharf is a condition precedent to the owner's right of arbitration under a government form time charter. The district court granted the charterer's motion for stay of arbitration on the ground that arrival at the wharf was a condition precedent. It denied summary judgment pending the outcome of this appeal. We reverse and remand for an order directing arbitration and other appropriate relief.

## I.

The libellant Fukaya Trading Co., S.A. "made and concluded" a charter party in New York City November 18, 1964 with the respondent Eastern Marine Corporation, owner of the S/S Eastern Argo. It was a time charter on the standard government form.[1] Under the charter party, the owner agreed "to let", and the libellant agreed "to hire" the Eastern Argo "from the time of delivery" in New Orleans between January 2 and January 13, 1965 until "redelivery" at a safe port in Japan or Formosa. The document provided that the vessel was "to be placed at the disposal of the Charterers" in the dock or at the wharf directed by the charterer. The owner was to give five days notice of readiness, but "time" was to "count from 7 a. m. on the working day following that on which written notice of readiness has been given". The agreement further provided for arbitration of "any dispute" that should arise between the owner and the charterer.

The Eastern Argo arrived at the New Orleans anchorage January 13, 1965 at 3:30 p. m. to load the charterer's cargo of scrap. The ship's agent that afternoon tendered written notice of readiness to the charterer. However, that same day the International Longshoremen's Association commenced a general strike in the Port of New Orleans. The union would not allow the Crescent River Port Pilots' Association to cross its picket line for the purpose of shifting the Eastern Argo to the charterer's wharf.

The union's refusal triggered a dispute between the parties as to whether the charter hire ran before the vessel reached the charterer's wharf. The charterer January 13, 1965 asserted that the notice of readiness received that afternoon was ineffective because it failed to comply with the alleged charter party requirement that the vessel must stand ready in the charterer's dock for hire to begin. The owner countered with a demand for hire the following day according to the charter party.

To relieve this stalemate, the owner February 5, 1965 threatened to demand arbitration unless assurance of payment for the first month's hire were received immediately. This assurance was not given, and February 10 the owner made formal demand for arbitration. The same day, the charterer filed this action

---

1. The government form "time charter," the conventional New York Produce Exchange form, originated in 1913. The form used by these parties carried amendments approved through October 3, 1946. The parties substituted new war risk and collision clauses and made several other changes not important to this litigation.

for declaratory judgment. The complaint seeks a declaration that the owner is not entitled to receive time charter hire until the vessel is placed in the charterer's dock.

February 12 the strike terminated in New Orleans, and the union granted permission to bring the Eastern Argo to the charterer's wharf. The owner informed the charterer that the vessel remained ready for immediate docking. The charterer replied that its dock was available immediately, but reiterated its position that charter hire commenced only upon arrival at the dock and that the only valid notice of readiness was the one received that day. The record shows no further negotiation on the "hire" issue at this time. The vessel proceeded to the charterer's dock, loaded the cargo, and sailed for Tokyo.

February 15, 1965, the owner moved to stay the declaratory judgment proceeding and petitioned for arbitration under the Federal Arbitration Act.[2] February 24 the court tentatively granted this motion and directed arbitration. At the same time, the court gave the charterer permission to file a supplemental libel, incorporating the facts of the eventual arrival of the vessel at the wharf.

March 17, 1965, the court reversed itself after a new hearing on the various pending motions. It now granted the charterer a stay of arbitration. The court stated that the arbitration was not in order because the ship was not delivered; the charter agreement did not become an executed agreement; and the contract was silent as to fortuitous events such as the maritime strike. The owner filed notice of appeal from this new order. The charterer pressed forward April 9 with a motion for summary judgment. However, the court, upon motion of the owner, declined to decide the case on summary judgment pending the outcome of the appeal to this court on the arbitration issue. The owner at this time also filed an affidavit alleging several factual issues, including the union's willingness to load at wharves other than the charterer's, that could bar summary judgment.[3]

## II.

The central issue in this appeal is whether the arrival of the Eastern Argo at the charterer's wharf was a condition precedent to the owner's right of arbitration under the charter. The arbitration clause provides "that should any dispute arise" between the owner and the charterer, the matter shall be referred to commercial men in New York for decision.[4] The owner contends that "any dispute" includes any matter that might arise between the execution of the contract November 18, 1964 and the arrival of the ship in January or February 1965. The charterer insists that the arbitration clause does not take effect until arrival of the vessel at a wharf appointed by the charterer. The charterer relies primarily on the clause in the charter that provides:

"WITNESSETH, That the said Owners agree to let, and the said Charterers agree to *hire the said vessel, from the time of delivery.* * * *" (Emphasis added.)

---

2. 9 U.S.C. §§ 1–14.

3. The Eastern Argo by this time had arrived in Tokyo. The owner asserted a lien on her cargo for hire including the disputed period before arrival of the vessel at the charterer's dock in New Orleans. The charterer moved this Court April 22, 1965, for fixing of a bond and release of the lien. We remanded the matter to the trial judge for appropriate relief. The trial court thereupon ordered release of the lien upon the filing of a $76,000 bond by the charterer.

4. The full arbitration clause is as follows:
"17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be commercial men."

The charterer also calls attention to a cancellation provision in the charter.[5] According to the charterer's construction of these provisions, no valid charter party and no enforceable arbitration agreement could arise until actual arrival of the vessel at its appointed wharf in New Orleans.

■ The time charter arbitration clause has been construed numerous times since the passage of the Federal Arbitration Act of 1925. The same general rule for enforcement of the clause has developed in maritime law as in other areas of the law: "[A]rbitration may be compelled except as to the issue whether the contract containing the clause was ever made or was void for fraud or other illegality." In re Pahlberg Petition, 2 Cir. 1942, 131 F.2d 968, 970. The charterer concedes the validity of this rule and makes no contention that the charter was void for fraud or illegality.

That leaves only one question in the case: Did the parties ever make a contract? The charterer admits that the November 18, 1964 time charter was a valid agreement. But it asserts that the contract could not take effect without satisfaction of a vital condition precedent: Arrival of the vessel at its dock. This condition supposedly arises from the phrase that the "Charterers agree to hire the said vessel * * * from the time of delivery." We find little merit in this contention.

■■ The "hire-delivery" phrase is a term of art in charter parties. The charterer would have the phrase signify that the November 18, 1964 charter party was nothing more than an agreement to contract for hire at a later date. We think that interpretation is wrong. The terms "to hire" and "time of delivery" each has a special meaning in maritime law. "To hire" in the time charter means to engage a vessel for hire or freight, the charges payable for the time the ship is utilized by the charterer.[6] It is unnecessary to form a new contract each time the hire begins. In this case as with most charters, the parties had concluded their contract for hire of the vessel well before the scheduled loading of cargo. The contract contains numerous specialized conditions governing the measurement and liability for hire before and after arrival of the vessel at the loading dock.[7] Formation of the contract prior to arrival of the vessel at the charterer's dock indicates the parties' intent to implement all these provisions, as well as the arbitration clause, upon signing of the instrument. The term "delivery" is something of an anachronism in the charter parties commonly used today. The "delivery" term originated in the older demise charter party, in which the owner delivered complete possession and control of the ship to the

5. "14. * * * [S]hould vessel not have given written notice of readiness on or before January 31st, 1965 * * * Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness."

6. See Carver, Carriage by Sea 322, 922 (Colinvaux ed. 1963).

7. E. g., Paragraph 5 of the charter party: "Payment of said hire to be made in New York in cash in United States Currency, semi-monthly in advance, and for the last half month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (Owners) may otherwise have on the Charterers. Time to count from 7 a. m. on the working day following that on which written notice of readiness has been given during office hours to Charterers or their Agents before 4 p. m., but if required by Charterers, they do have the privilege of using vessel at once, such time actually used working cargo, shifting berths or bunkering to count as hire."

charterer.[8] In the modern carriage charter party, the owner does not deliver possession but agrees that during a certain period he will render the services of his servants and crew to carry goods put on board by the charterer.

■ The short of it is that the "hire-delivery" phrase has only general legal significance in the time charter of this case. We speculate that the phrase expresses in a broad fashion the agreement of the parties that the charterer will incur charges for hire from the time the vessel has become an "arrived ship" after proper "notice of readiness" according to the precise rules set out in maritime law and in the charter party itself. We make no pretense to an exhaustive construction of the complex "hire" and "delivery" provisions of this contract. That task we leave to the arbitrators. We do hold that under the time charter before the court the "hire * * * from the time of delivery" phrase does not make arrival of the vessel at the charterer's wharf a condition precedent to operation of the arbitration clause.

The libellant places reliance on El Hoss Engineering & Transport Co. v. American Independent Oil Co., 2 Cir. 1961, 289 F.2d 346, cert. denied, 368 U.S. 837, 82 S.Ct. 51, 7 L.Ed.2d 38, in which the court denied arbitration in connection with an auction sale contract. In El Hoss, American Oil called for bids for the purchase of transportation equipment that it owned. El Hoss was low bidder and American Oil signed its bid. However, the instrument contained a clause that acceptance by American was conditioned upon the bidder's compliance with certain conditions regarding guarantees, performance bonds, and insurance. Differences subsequently arose between the parties over the fulfillment of these conditions. El Hoss petitioned for arbitration of the issues involved. The Second Circuit, in reversing an arbitration order, remanded the case for findings as to whether the conditions were performed, waived, or excused. The court reasoned that every clause of the agreement, including the arbitration clause, was conditioned upon the bidder's satisfactory performance of basic financial guarantees.

■ We find the time charter of the present case quite different from the conditional acceptance instrument in El Hoss. The conditional acceptance agreement is peculiar to auction transactions and other instances of uncertain credit or authority. In those situations, the seller often reserves acceptance of an offer pending the satisfaction of specified conditions. The contract of sale does not come into being until the seller is satisfied that the conditions have been met. See 1 Corbin, Contracts § 24 (1963). The ordinary time charter, as involved in this case, does not provide any express conditions for the acceptance of the charterer's offer. We know of no custom in the shipping trade that compels an implied condition of arrival to the initial formation of a contract between the charterer and the owner. In the absence of an express condition to acceptance, as was present in El Hoss, the court will presume the formation of a contract upon execution of the document if all the other standard contractual requirements, such as consideration and capacity, have been satisfied. Since the libellant alleges no defects in the formation of the contract other than the condition precedent, we conclude that the arbitration clause did take full effect upon the execution of the agreement November 18, 1964.

■■ The event of the New Orleans maritime strike does not defeat the arbitrators' jurisdiction. American courts have made clear that the frustration of a charter party does not vitiate the arbitration clause. The arbitration clause survives the frustration for the purpose of settling, among other things, whether

8. See Sea and Land Securities v. Dickinson (1942) 2 K.B. 65, 69, cited in Carver, Carriage by Sea 303 (Colinvaux ed. 1963); Gilmore and Black, Admiralty 204–216 (1957); cf. Guzman v. Pichirilo, 1962, 369 U.S. 698, 699–700, 82 S.Ct. 1095, 8 L.Ed.2d 205, 207–08.

the contract has in fact been frustrated. In re Pahlberg's Petition, 2 Cir. 1942, 131 F.2d 968; Goldhill Trading & Shipping Co. v. Caribbean Shipping Co., S.D. N.Y.1944, 56 F.Supp. 31; Anno., 3 A.L. R.2d 383, 397–400 (1949).

■ Nor does the cancellation clause in the charter party defeat arbitration. The contract says that if notice of readiness has not been given by January 31, 1965, the charterers have the option of "cancelling this charter at any time not later than the day of vessel's readiness." The clause does not say that the contract itself would be cancelled. American courts for many years have refused as a matter of law to allow the repudiation of an arbitration clause by the cancellation of the charter by either party. The arbitration provision remains operative to settle the issues that might arise from the cancellation. In re Pahlberg, supra; American Locomotive Co. v. Chemical Research Corp., 6 Cir. 1948, 171 F.2d 115, 120, cert. denied, 1949, 336 U.S. 909, 69 S.Ct. 515, 93 L.Ed. 1074; cf. Sonotone Corp. v. Ladd, 1962, 17 Wis.2d 580, 117 N.W.2d 591; Terminal Auxiliar Maritama, S. A. v. Winkler Credit Corp., 1959, 6 N.Y.2d 294, 189 N.Y.S.2d 655, 160 N.E.2d 526.

### III.

■ The libellant also contends that the owner waived arbitration by its renewed tender of readiness and eventual performance of the charter following the strike. The libellant observes that in accepting the renewed tender, it reiterated its position "that charter hire commences upon arrival at our dock in accordance with terms of charter party." The subsequent delivery of the vessel, argues the libellant, demonstrated acceptance by the owner of an amendment to the original charter party to the effect that the "hire" did not begin until arrival at the dock. The supposed amendment, in the libellant's view, eliminated the issue to be arbitrated, and therefore, this appeal from the stay of arbitration is moot. We do not agree. The original dispute, as the charterer conceded, was over the time at which charter hire commenced. The owner January 22, 1965 expressly asserted by letter that charter hire commenced 7 a. m. January 14 following notice of readiness January 13. The owner demanded arbitration February 10 on the same issue. We conclude that the owner took sufficient steps to reserve its rights as to the time hire commenced. The correspondence between the parties does not demonstrate an intention to amend the charter party. The charterer purported merely to "reiterate our position" rather than to amend the conditions for the owner's performance. The libellant cites Petition of Howard, E.D.N.Y.1943, 53 F.Supp. 556, 560 in support of its contention of waiver. But in that case the court based its decision of waiver on the fact that the owner accepted without protest an extensive written amendment to the seaworthiness clause of the charter party. In the present action, the owner vigorously asserted its right to the disputed demurrage on several occasions. We hold that the owner did not waive its right to the disputed hire by its eventual performance of the carriage.

\* \* \* \* \* \*

We reverse the order staying arbitration and remand for an order directing that arbitration go forward. The district court may hold the case open to grant appropriate relief in connection with the arbitration, including maintenance of a bond in sufficient amount to secure the owner's claim.