**CONTINENTAL GRAIN COMPANY**

v.

**TOKO LINES and the MOTOR SHIP PACIFIC SAGA, her engines, etc. and Ocean Bulkers, Inc., in personam.**

Civ. A. No. 71–3129.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Nov. 18, 1971.

William S. Stone, Joaquin Campoy, of Campoy, Hurley & Senter, New Orleans, La., for plaintiff.

Henry J. Read, John Hammond, of Montgomery, Barnett, Brown & Read, New Orleans, La., Bigham, Englar, Jones & Houston, New York City, for defendants Pacific Saga and Ocean Bulkers, Inc.

COMISKEY, District Judge.

This action was brought by plaintiff Continental Grain Co. to recover damages for breach of contract. It is alleged by plaintiff that it had a contract of affreightment with Toko Lines (KKK), under which Toko was to transport a cargo of grain which was to be loaded at Reserve, Louisiana. The grain was to be transported by the Motor Ship PACIFIC SAGA, a vessel owned by Ocean Bulkers, Inc. and time chartered to Toko Lines. This suit was brought *in personam* against Toko Lines and Ocean Bulkers and *in rem* against the PACIFIC SAGA. The vessel was seized by the United States Marshal pursuant to an admiralty writ of foreign attachment.

Ocean Bulkers, the vessel owner, now moves for a summary judgment dismissing the *in rem* process and attachment of the PACIFIC SAGA. The sole issue to be decided by the Court is whether or not the contract of affreightment entered into by Continental Grain and Toko Lines was actually executed. For it is clear that no maritime lien attaches for the breach of an executory contract. See Gilmore and Black, The Law of Admiralty, § 9–22.

The pertinent facts are undisputed. Both sides concur that Toko Lines agreed to receive the grain cargo at Reserve, Louisiana, during the month of November, 1971. On November 7, 1971, the PACIFIC SAGA arrived in New Orleans at the Napoleon Avenue wharf with cargo for New Orleans and Houston. She completed discharge of the cargo consigned to New Orleans on November 10. Inspection of the vessel for the purpose of loading the grain cargo at Reserve was commenced at the Napoleon Avenue wharf on the morning of November 11. However, on the same day the PACIFIC SAGA departed down river from New Orleans without taking the grain cargo aboard. This was done pursuant to instructions from Toko Lines. It is undisputed that the vessel never proceeded further north than New Orleans. No evidence has been offered to show that any part of the grain cargo was loaded aboard the PACIFIC SAGA or that such cargo was ever actually under the control of that vessel's personnel.

In determining whether the contract of affreightment was actually consummated or remained merely executory, the Court must decide whether a union between ship and cargo ever took place. Counsel for Ocean Bulkers relies in part on Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364 (1923), in which the Supreme Court held that even though a vessel had partly executed a contract of affreightment by taking on board a part of the cargo, the contract remained executory as to the remaining cargo. On the other hand, counsel for Continental Grain cites Bulkley v. Naumkeag Steam Cotton Co., 65 U.S. (24 How.) 386, 16 L. Ed. 599 (1860), in which the Supreme Court held that a maritime lien attached even though the cargo never reached the vessel but was being transported to the vessel by a lighter which sunk in transit. Counsel for plaintiff also cites Krauss

Bros. Lumber Co. v. Dimon S.S. Corp., 290 U.S. 117, 121, 54 S.Ct. 105, 106, 78 L.Ed. 216 (1933), in which the Supreme Court said:

"Only upon the lading of the vessel *or at least when she is ready to receive the cargo*—when there is 'union of ship and cargo'—does the contract become the contract of the vessel and the right to the lien attach. No lien for breach of the contract to carry results from failure of the vessel to receive and load the cargo or a part of it. See The Osaka Shosen Kaisha v. Pacific Export Lumber Co., supra." (Emphasis added.)

Counsel for plaintiff argues that this language, which was quoted with approval by the Fifth Circuit Court of Appeals in Belvedere v. Compania Plomari De Vapores, S. A., 189 F.2d 148, 150 (5th Cir. 1951), supports his contention that the contract was executed when the PACIFIC SAGA was inspected at New Orleans in preparation for loading even though the cargo was never actually taken on board.

■ It is the opinion of this Court that the important question is not whether the cargo was taken aboard the PACIFIC SAGA or whether the vessel was made ready to receive the cargo. Rather, we believe that the real issue in this case is whether the cargo ever passed into the custody and control of the ship's personnel. In Bulkley v. Naumkeag Steam Cotton Co., *supra,* the Supreme Court said that even though the cargo was never taken aboard the vessel, the maritime lien attached because it had come under the custody and control of the ship's master when it was put aboard the ill-fated lighter:

"In the present case the cargo was delivered in pursuance of the contract, the goods in the custody of the master, and subject to his lien for freight, as effectually as if they had been upon the deck of the ship * * *.

" * * * There is no necessary physical connection between the cargo and the ship, as a foundation upon which to rest this liability. * * *

[W]e think no well-founded distinction can be made, as to the liability of the owner and vessel, between the case of the delivery of the goods into the hands of the master at the wharf, for transportation on board of a particular ship, in pursuance of the contract of affreightment, and the case as made, after the lading of the goods upon the deck of the vessel; the one a constructive, the other an actual possession * * *." 65 U.S. at 393–394.

In Baer, Admiralty Law of the Supreme Court, § 18–13 at 423–424, the Bulkley case is summarized as follows:

"It is repeatedly said that there can be no lien in favor of the cargo owner until the cargo has been placed on board. However, the Supreme Court has declared that the actual placement on board is not required. It is sufficient if the cargo has been taken into custody by the carrier under a contract of affreightment and is under the control of the ship's officers."

In Gilmore and Black, The Law of Admiralty, § 9–22 at 522, the rule is stated as follows:

"With respect to contracts of affreightment * * * the usual point of execution which will determine the existence of a lien is the delivery of the cargo to the ship. The physical placing on board, however, is not an absolute prerequisite: goods placed on board lighters for subsequent loading and even goods on wharf or dock may be sufficiently 'delivered' for the lien to attach. In the wharf and lighterage cases the crucial issue becomes whether, although not actually on board, the goods are in fact subject to the control of the carrier through the master: it is more accurate, as these cases indicate, to describe the rule in terms of 'control' than of 'delivery'. If the goods on wharf or in lighters are still in the control of the shipper, or of an independent contractor or even of a charterer of the type who does not himself man the vessel, the lien has not yet arisen."

In the case at bar the undisputed material facts show without being countervailed by the opposing side that the cargo never passed out of the custody of the plaintiff into the control of Toko Lines. It is undisputed that the vessel never reached Reserve, Louisiana, and there is simply no proof that the grain cargo was ever given over to the custody of persons representing either the PACIFIC SAGA or Toko Lines. We therefore hold that the contract of affreightment between Continental Grain and Toko Lines remained wholly executory, and consequently no maritime lien attached.