INTEROCEAN SHIPPING CO. et al.

v.

M/V LYGARIA, her engines, tackle, etc., in rem

and

Evidar Compania Naviera, S.A., in personam.

Civ. A. No. M–79–567.

United States District Court, D. Maryland.

April 16, 1981.

Solomon Kaplan, Paul D. Bekman, and Kaplan, Heyman, Greenberg, Engelman & Belgrad, Baltimore, Md., for defendant Evidar Compania Naviera, S.A.

William C. Stifler, III, and Niles, Barton & Wilmer, Baltimore, Md., for intervening libellant First Dallas Limited.

Richard R. Jackson, Jr., Warren B. Daly, Jr., and Ober, Grimes & Shriver, Baltimore, Md., for intervening libellant Armada Coasting Aps.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

In this admiralty action, the mortgagee and the former owner of the M/V Lygaria have moved for partial summary judgment with respect to certain *in rem* claims of the time charterer. Movants contend that a time charterer is not entitled to a maritime lien for "prospective lost profits" due to the owner's breach of the charter party in failing to maintain the vessel in a seaworthy condition. The charterer's position is, of course, to the contrary. The relevant facts are undisputed. The parties disagree, however, about the legal consequences attaching to those facts.

### I. Factual Overview

At all times relevant to this action, the M/V Lygaria was a Greek flag vessel registered under the laws of the Republic of Greece. The vessel was owned by Evidar Compania Naviera, S.A. (Evidar), a company incorporated under the laws of Panama. First Dallas Limited (First Dallas) was the mortgagee of the M/V Lygaria.

On August 11, 1976, Evidar entered into a twelve month time charter with Armada Coasting Aps (Armada), a Danish company. The charter party, which was on a standard New York Produce Exchange form, included an option in favor of Armada for an additional six month term (Paper No. 14, Ex. 1). Pursuant to the original charter party, the vessel was delivered to Armada on October 17, 1976, at Piracus, Greece. On September 12, 1977, Evidar and Armada agreed to extend the original charter party for twelve months from October 17, 1977, with Armada having an option of "a further 6 months, 45 days more or less in Charterer's option on final declared period."

(Paper No. 14, Ex. 2). Under this agreement, the other terms and conditions of the original charter party remained in effect.

The vessel became disabled at sea on its way from Norway to Baltimore on February 1, 1979. Since the hull damage could not be repaired at sea, the vessel was taken to Providence, Rhode Island for temporary repairs. The vessel arrived in the port of Baltimore in early March of 1979.

Anticipating that the vessel would arrive in Baltimore on February 1, 1979, Armada had, on January 25, 1979, entered into a subcharter with Navigazione San Paolo S.P.A. (San Paolo) for one voyage from the United States to West Africa (Paper No. 124, Ex. 1). Due to the breakdown of the M/V Lygaria, San Paolo cancelled the subcharter on February 2, 1979.

On March 21, 1979, the vessel was arrested in the port of Baltimore by the United States Marshal following the filing of a libel *in rem* by the Bethlehem Steel Corporation and the Interocean Shipping Company. Subsequently, intervening libels were filed by Armada, both *in rem* against the vessel or the proceeds of her sale and *in personam* against Evidar. First Dallas also filed an intervening *in rem* libel based upon the foreclosure of Evidar mortgage.

The vessel was ultimately sold by the United States Marshal and the sale proceeds were placed into the Registry of the Court. The sale was ratified by the court and, after payment of expenses and the settlement of certain claims, there remains approximately $425,000 in the Registry.

Armada's amended intervening libel alleges total damages for breach of the charter party in the amount of $342,851.36, of which $255,000 is claimed for lost profits in connection with the cancelled San Paolo subcharter (Paper No. 124, at 11). All of Armada's claims are based upon the unseaworthiness of the vessel. Specifically, Armada charges Evidar with: (1) tortious failure to maintain the vessel; (2) tortious concealment from and/or misrepresentation to Armada by Evidar of its capacity and intentions with respect to maintaining the

vessel; (3) negligent maintenance of the vessel; and (4) tortious breach of the warranty of seaworthiness (Paper No. 59 at 5–8).

## II. Discussion

■ It has long been settled that a libel *in rem* is maintainable only in connection with a maritime lien. Claims otherwise maritime in nature, but not giving rise to a lien, must be pursued *in personam*. *See, e. g., The Resolute*, 168 U.S. 437, 440, 18 S.Ct. 112, 113, 42 L.Ed.2d 533 (1897); *The Rock Island Bridge*, 73 U.S. (6 Wall.) 213, 215, 18 L.Ed. 753 (1867).

In *Todd Shipyards v. The City of Athens*, 83 F.Supp. 67 (D.Md.), *affirmed sub nom. Acker v. The City of Athens*, 177 F.2d 961 (4th Cir. 1949) (per curiam), Judge Chesnut described the nature of the maritime lien as follows:

"The maritime lien is of very ancient lineage. Its conceptual origin lies in the personification of the ship itself. The ship as an entity, considered apart from the personal liability of the owner, becomes responsible for benefits conferred and damages committed by her. One who bestows such benefits or suffers such damage becomes entitled to an interest in the ship (*jus in re*) which constitutes the maritime lien, which is generally distinguished from the common law lien in that the former is not possessory in nature while the latter is. Thus the maritime lien constitutes an interest in the ship itself while ordinarily the common law lien is not an interest *in* the thing subject to it but a right to enforce a claim *against* it. Again, the enforcement of the true maritime lien is the peculiar and exclusive jurisdiction of the federal courts in admiralty."

83 F.Supp. at 74–75 (emphasis original).

In other words, as Mr. Justice Holmes commented, "[t]he ship is a *res* not because it is tangible but because it is a focus of rights that in like manner may be dealt with by the law." *United States v. Freights, etc., of S. S. Mount Shasta*, 274 U.S. 466, 470, 47 S.Ct. 666, 71 L.Ed. 1156 (1927).

■ The historical reasons for the creation of admiralty jurisdiction and the maritime lien have been the subject of much commentary. *See, e. g.,* 1 *Benedict on Admiralty* §§ 1–127 (7th ed. 1974); G. Gilmore & C. Black, *The Law of Admiralty* 586–94 (2d ed. 1975). In *The Saturnus*, 250 F. 407 (2d Cir.), *cert. denied,* 247 U.S. 521, 38 S.Ct. 583, 62 L.Ed. 1247 (1918), Judge Hough summarized concisely the reason for the lien's creation.

"The ancient and customary lien of the sea is not maintained, nor was it created (so far as history reveals its origin) for the convenience or assurance of parties, but for the encouragement of commerce and shipping as a presumed benefit to the public, in respect of an occupation hazardous and uncertain beyond most land ventures."

250 F. at 414. Consequently, due to the special rights afforded the holder of a maritime lien, it is *"stricti juris* and cannot be extended by construction, analogy or inference." *Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 499, 43 S.Ct. 172, 174, 67 L.Ed. 364 (1923). *See The Yankee Blade,* 60 U.S. (19 How.) 82, 89, 15 L.Ed. 554 (1857); *Old Point Fish Co. v. Haywood,* 109 F.2d 703, 705 (4th Cir. 1940).

The arguments presented in this motion are quite straightforward. Evidar and First Dallas contend that Armada's claim for prospective lost profits, while perhaps maintainable *in personam* against Evidar, cannot be asserted *in rem* because they relate to an "unexecuted" portion of the time charter. That is to say, there was no default of the vessel while the cargo to which Armada's claim relates was on board or within the vessel's control. Armada asserts that its charter with Evidar was "wholly executed" because the vessel had been "delivered" to it months before the breakdown. In other words, Armada contends that although the San Paolo subcharter may have been "executory" at the time of the breakdown, the Armada time charter was not. According to Armada, therefore, it may maintain an *in rem* action for any

provable damages flowing from Evidar's breach of the Armada time charter party, regardless of whether the vessel was engaged in carrying the cargo for which it seeks lost profits when the breakdown occurred.

It is apparent to this court that much confusion has resulted from the often imprecise use of the word "executory" in connection with maritime claims relating to breaches of charter parties and other maritime contracts. The question of whether Armada can recover *in rem* for prospective lost profits must be answered by analyzing the nature of charter parties and the rationale underlying the so-called executory contract doctrine.

■ Charter parties are generally divided into two classes, demise charters and contracts of affreightment. A demise charter, which is also known as a bareboat charter, arises when the vessel's owner surrenders all possession and control of the ship to the charterer. *See, e. g., United States v. Shea,* 152 U.S. 178, 189, 14 S.Ct. 519, 522, 38 L.Ed. 403 (1894); H. Baer, *Admiralty Law of the Supreme Court* § 12–2 (1979). "[A]nything short of such a complete transfer is a time or voyage charter party or not a charter party at all." *Guzman v. Pichirilo,* 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962). *See Gaspard v. Diamond M. Drilling Co.,* 593 F.2d 605, 606 (5th Cir. 1979). Under a demise charter, the vessel must be seaworthy at the commencement of the charter period but the owner generally has no maintenance responsibilities subsequent to the delivery of the vessel. *See Kerr-McGee Corp. v. Law,* 479 F.2d 61, 63 (4th Cir. 1973).

■ The other basic type of charter party, an affreightment, is in turn subdivided into voyage charters and time charters. Under a voyage charter, the vessel remains in the possession and control of the shipowner and its cargo space is rented only for a particular voyage or group of voyages. *See* 1 J. Bes, *Chartering and Shipping Terms* 76–77 (10th ed. 1977). Under a time charter, the owner's crew continues to navigate the vessel while its cargo carrying capacity is rented by the time charterer for a fixed period. *See, e. g., Yeramex International v. S. S. Tendo,* 595 F.2d 943, 946 (4th Cir. 1979); *Randolph v. Waterman Steamship Corp.,* 166 F.Supp. 732, 733 (E.D. Pa.1958). The time charterer may make as many voyages as can be fitted into the charter period, and the vessel is subject to the time charterer's direction as to the ports visited and the cargo loaded. The obligation to maintain the seaworthiness of the vessel, however, remains with the vessel owner throughout the charter period. *See, e. g., Wyche v. Oldendorff,* 284 F.Supp. 575, 576–77 (E.D.Va.1967); *Saridis v. S. S. Paramarina,* 216 F.Supp. 794, 797 (E.D.Va.1962).

The Supreme Court first adopted the "executory contract" doctrine in *The Schooner Freeman v. Buckingham,* 59 U.S. (18 How.) 182, 15 L.Ed. 341 (1855). Writing for the Court, Mr. Justice Curtis stated:

"Under the maritime law of the United States the vessel is bound to the cargo, and the cargo bound to the vessel, for the performance of a contract of affreightment; but the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, *and a cargo shipped under it.*"

59 U.S. (18 How.) at 188 (emphasis supplied). *See The Saturnus* 250 F. at 411–12; *The Valmar,* 38 F.Supp. 618, 620–21 (E.D. Pa.1941).

To avoid the application of this doctrine to its claim for prospective lost profits due to the cancellation of the San Paolo subchapter, Armada relies primarily upon dictum in Judge Hough's opinion in *The Oceano,* 148 F. 131 (S.D.N.Y.1906), and a statement in G. Gilmore & C. Black, *The Law of Admiralty* (2d ed. 1975).

Armada first relies on the following language in the Gilmore and Black treatise: "Under charter-parties the point of 'execution' would be the delivery of the vessel under the charter." G. Gilmore & C. Black, *The Law of Admiralty* 636 (2d ed. 1975). Next, Armada points to the following comment in *The Oceano,* which involved a completed voyage charter:

"As soon as the performance of a charter party is commenced a lien exists on the vessel in favor of the shipper or charterer, and a suit in rem may be maintained for any liability of the master or owner arising therefrom. The Director (D. C.) 26 Fed. 708. Damages sustained by a charterer through breach of a charter contract constitute a lien on the vessel. The Panama, Olcott, 343, Fed.Cas. No.10,703."

148 F. at 133.

The statement relied on by Armada from the Gilmore and Black treatise is taken out of context and is, in any event, overbroad [1]. The point the authors were making was that no maritime lien could arise in favor of a charterer, even for advanced charter hire, if the vessel had not been placed at the charterer's disposal in the first instance. G. Gilmore & C. Black, *The Law of Admiralty* 636 (2d ed. 1975), *citing The Yankee Blade*, 60 U.S. (19 How.) at 90; *Belvedere v. Compania Plomari de Vapores, S. A.*, 189 F.2d 148, 149–50 (5th Cir. 1951). Further, on the next page, the authors state the traditional rule: "With respect to contracts of affreightment (evidenced by bills of lading or charter parties) the usual point of execution which will determine the existence of a lien is the delivery of the cargo to the ship." G. Gilmore & C. Black, *The Law of Admiralty* 637 (2d ed. 1975).[2]

More importantly, however, the facts of *The Oceano*,[3] as well as the cases cited by Judge Hough, do not support the application of Judge Hough's dictum, regarding available damages, to Armada's claim for prospective lost profits. In *The Oceano*, the owner refused to reimburse the charterer for freight advances at the end of the voyage. Judge Hough characterized the case

as one involving "a deliberate refusal to repay an 'advance of freight' and [such refusal] therefore constitut[ed] *a breach of the charter that gave birth to the freight.*" 148 F. at 133 (emphasis supplied).

In *The Director*, 26 F. 708, 710 (D.Ore. 1886), the court noted that "the performance of the contract had commenced by the lading of the cargo." In *The Panama*, 18 Fed.Cas.No.10,703 (S.D.N.Y.1846), the charterers had loaded the cargo on the vessel and paid freight advances to the master. The vessel never sailed, however, because she was arrested for the nonpayment of a bottomry bond. Under these circumstances, the court held that the charterers had a maritime lien for the freight advances. 18 Fed.Cas. at 1078–79. In all of these cases, therefore, the contract was held to be executed because cargo had been loaded upon the vessel.

A Second Circuit panel in *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024 (2d Cir. 1973), adopted the statement in the Gilmore and Black treatise that the delivery of the vessel to a time charterer commences performance of the time charter, and removes it from executory status. The panel also relied upon the dictum in *The Oceano* relating to the kinds of claims giving rise to maritime liens for the owners' breach of the charter party. 480 F.2d at 1027–28 & n. 6. In that case, the panel affirmed the District Court's award of a maritime lien to a time charterer where the owner had wrongfully withdrawn the vessel prior to the end of the charter period. The relevant item of damage afforded lien status was the time charterer's indemnity claim against the owner, based on an arbitrator's award, for monies the charterer had paid to a shipper whose

---

**1.** One commentator has criticized the use of the word "delivery" in the time charter context on the ground that there is no actual delivery of control of the vessel to the charterer in any nondemise charter. Allen, Liens: Liabilities Arising From Delay or Failure in Performance, 49 *Tulane L.Rev.* 970, 989 (1975).

**2.** It should be noted that the question of whether an affreightment contract has been "executed" usually arises in situations where the cargo shipper seeks a lien for the vessel's fail-

ure to either carry or deliver the cargo. *See, e. g., Continental Grain Co. v. Toko Lines*, 333 F.Supp. 1349, 1350–51 (E.D.La.1971).

**3.** Gilmore and Black have also cited *The Oceano* for the broad proposition that the owner's breach of the charter party gives rise to a lien in favor of the charterer for all losses flowing from the breach. G. Gilmore & C. Black, *The Law of Admiralty*, 631–32 n. 103 (2d ed. 1975).

cargo was not carried due to the premature withdrawal of the vessel. 480 F.2d at 1027.

The Second Circuit panel in *M/V Tequila* also noted its disagreement with the decision of a Fifth Circuit panel in *Belvedere v. Compania Plomari de Vapores, S. A.*, 189 F.2d 148 (5th Cir. 1951). In the *Belvedere* case, the owner entered into what was apparently a voyage charter, although drawn on a time charter form, under which the vessel was to transport bananas from Mexican ports to Floridian ports. Although the vessel was delivered to the charterer, and twice broke ground for Mexico, the vessel was unable to load the bananas due to the breakdown at sea of the vessel's engines. The bananas had been cut in anticipation of the vessel's arrival and were lost by spoilage. The charterer sought a maritime lien for, among other things, the value of the bananas, less salvage value.

In rejecting the charterer's *in rem* claim, the Fifth Circuit panel held the charter party to be executory. The court reasoned as follows:

> "Loss of the two cargoes of bananas was one resulting from the vessel's failure to receive and load the cargo, which involves a simple breach of an executory contract of charter, for which libellant is not entitled to a maritime lien against the vessel, because the cargo never having been placed on board, it is not bound to the vessel, and the vessel itself can not be in default for the loss of goods never received on board."

189 F.2d at 150.

A case in this circuit relied on by the movants in opposition to Armada's asserted lien for prospective lost profits is *Clinton v. Smith & Terry, Inc.*, 249 F. 119 (4th Cir. 1918). In that case, the time charterer of a coal barge cancelled the charter after one voyage because the barge was unseaworthy. In the District Court, the charterer had sought a maritime lien for monies it would have earned had the barge been seaworthy. The claim was based upon the difference between the amount of cargo the barge

actually carried and that it should have carried if it had been fit to carry a full load. Agreeing with the District Court that such a claim failed on the merits, Judge Knapp, nevertheless, stated as follows: "Even if the fact were found otherwise we should feel constrained to hold that this item of damage, *which is in the nature of prospective profits*, is not sustainable as a lien on the barge." 249 F. at 120 (emphasis supplied).

Recently, in *European-American Banking Corp. v. M/S Rosaria*, 486 F.Supp. 245 (S.D. Miss.1978), the court ruled that a seven-year time charterer could not maintain an *in rem* action to recover prospective lost profits. In that case, the vessel was arrested some four years into the time charter when the owners defaulted on the mortgage. The time charterer contended that the owners' "tortious" failure to lift the arrest gave rise to a maritime lien for the profits it would have made had the vessel been released and available to carry cargos. No cargo was aboard the vessel at the time of the arrest. 486 F.Supp. at 255. Relying on *Clinton v. Smith & Terry, Inc.*, the court held as follows:

> "The Court concludes there is no basis in law for an extension of the concept of maritime liens, much less that of preferred maritime liens, under a theory of tort to the claim of a time charterer for loss of prospective profits on the unexecuted portion of a long-term charter party."

486 F.Supp. at 256.

■ None of the cases discussed above stands squarely for the propositions urged by any of the parties. However, based on the policy considerations underlying the maritime lien, as well as the nature of a time charter party, the court concludes that Armada should not be afforded a maritime lien for the profits it would have made from the San Paolo subcharter had the M/V Lygaria not become unseaworthy prior to the loading of the cargo to be carried under that subcharter.[4]

4. Armada's attempt to transform what would, at best, be a contract claim into a tort claim

does not alter the result in this case. Reliance on collision cases, such as *The Barnstable*, 181

A time charter party is simply an agreement between a vessel owner and a charterer that the latter may use the vessel's cargo carrying capacity to transport unspecified cargos for a fixed period of time. Like a voyage charter, or an agreement to transport particular passengers or goods, the time charter is a contract of affreightment. With respect to the latter three categories of maritime contracts, it is well settled that no maritime lien arises for breach of the contract of affreightment until there is some union between the vessel and the cargo or passengers to be carried under the agreement.

In *Osaka Shosen Kaisha v. Pacific Export Lumber Co.*, 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364 (1923), the Court held that a voyage charterer could not maintain an *in rem* action for its financial loss occasioned by the master's refusal to accept a "full load" of cargo. Thus, like the barge charterer in *Clinton v. Smith & Terry, Inc.*, the claimant in *Pacific Export* sought a maritime lien for the difference between the value of the cargo the vessel actually carried and what it could have carried had the master taken on a full load. The Court in *Pacific Export* expressly rejected the claimant's argument that a lien arose for the value of the cargo not carried because the affreightment contract had been "partially executed," or in other words, that the vessel had commenced performance by loading some of the cargo. Writing for the Court, Mr. Justice McReynolds stated:

"The contract of affreightment itself creates no lien, and this Court has consistently declared that the obligation between ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in the master's custody. We think the lien created by the law must be mutual and reciprocal; the lien of the cargo owner upon the ship is limited by the corresponding and reciprocal rights of the ship owner upon the cargo. *See The Thomas P. Sheldon*, 113 F. 779, 782, 783.

The theory that partial acceptance of the designated cargo under a contract of affreightment creates a privilege or lien upon the ship for damages resulting from failure to take all, is inconsistent with the opinions of this Court and, we think, without support of adequate authority." 260 U.S. at 499–500, 43 S.Ct. at 174.

Subsequently, in *Krauss Brothers Lumber Co. v. Dimon Steamship Corp.*, 290 U.S. 117, 54 S.Ct. 105, 78 L.Ed. 216 (1933), which involved a fully performed bill of lading contract, the Court reiterated the requirements for a maritime lien. Mr. Chief Justice Stone stated:

"This engagement of the vessel, or its hypothecation, as distinguished from the personal obligation of the owner, does not ensue upon the mere execution of the contract for transportation. Only upon the lading of the vessel, or at least when she is ready to receive the cargo—where there is 'union of ship and cargo'—does the contract become the contract of the vessel and the right to the lien attach. No lien for breach of the contract to carry results from failure of the vessel to receive and load the cargo or a part of it." 290 U.S. at 121, 54 S.Ct. at 106.

The Court in *Krauss Brothers* went on to hold that a shipper who had mistakenly paid excess freight at the end of the voyage

U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901) is misplaced. In that case a vessel had run down and sunk a schooner off of the coast of Massachusetts. The Court simply applied the well established admiralty principle that when a vessel damages that of another, the offending vessel can be held to account for the damage to the third party's vessel.

Similarly inapposite are the "fraudulent" cargo cases such as *The Henry W. Breyer*, 17 F.2d 423 (D.Md.1927). In that case, the *in rem* negligence claim was sustainable as a lien, when the vessel failed to break ground, because the claimant's cargo had been loaded on the ship. Further, the fraud complained of herein, the owner's concealment of its intentions regarding maintenance of the vessel, are of a personal nature. As such, they will not support a maritime lien. *See, e. g., Diaz v. The S. S. Seathunder*, 191 F.Supp. 807, 815–16 (D.Md.1961); *Atlantic Steamer Supply Co. v. The S. S. Tradewind*, 153 F.Supp. 354, 357 (D.Md.1957).

was entitled to a lien even though the cargo had been discharged. 290 U.S. at 125–26, 54 S.Ct. at 107–108.

 The unwavering principle that emerges from these cases is that a maritime lien for claims respecting monies lost in connection with contracts of affreightment can arise only when the default occurs after the specific cargo for which the lien is sought is loaded upon, or otherwise is within, the vessel's control. It is this physical relationship between the cargo and the ship that gives rise to the mutual and reciprocal rights necessary for the creation of a maritime lien for breach of affreightment contracts. *See, e. g., Iran Express Lines v. Sumatrop, AG,* 563 F.2d 648, 651 (4th Cir. 1977); 1 *Benedict on Admiralty* § 185 (7th ed. 1974).

 In the instant case, Armada seeks a maritime lien for the profit it would have made had the M/V Lygaria been available to perform the San Paolo subcharter. It is undisputed, however, that none of the cargo to be carried was ever loaded upon the vessel. Consequently, even assuming that the vessel's unavailability resulted from the owner's failure to maintain her in a seaworthy condition, and that such failure was a breach of the time charter party, Armada has no maritime lien for prospective lost profits. The court holds, therefore, that although Armada may have a valid *in personam* claim for lost profits against Evidar, *see, e. g., Polar Steamship Corp. v. Inland Overseas Steamship Corp.,* 136 F.2d 835, 840–41 (4th Cir. 1943); W. Poor, *American Law of Charter Parties and Ocean Bills of Lading* § 85 (5th ed. 1968), it cannot maintain an *in rem* action for prospective lost profits in connection with Evidar's alleged breach of the charter party or tortious failure to maintain the vessel in a seaworthy condition.

Accordingly, it is this 16th day of April, 1981, *ORDERED*:

(1) The motion for partial summary judgment of First Dallas and Evidar is GRANTED.

(2) Armada's *in rem* claim for prospective lost profits relating to the cancelled San Paolo subcharter is DISMISSED.