**E.A.S.T., INC. OF STAMFORD, CONNECTICUT**

v.

**M/V ALAIA, etc.**

Civ. A. No. 87–4931.

United States District Court, E.D. Louisiana.

Nov. 16, 1987.

Antonio J. Rodriguez, Mary Campbell Hubbard, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for plaintiff.

Robert B. Deane, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for claimant.

## ORDER & REASONS

CHARLES SCHWARTZ, Jr., District Judge.

East has come south to send everyone north before a vessel went west. Because the law on maritime liens should not wander in aimless directions, the Court believes a written explanation of that law as it pertains to this case is fit.

This matter is before the Court on the motion of claimant Advance Company, Inc. of Liberia (Advance) to release the vessel

from seizure or alternatively to set the amount of security to be posted by claimant, and to set the amount of countersecurity to be posted by plaintiff. At the post-seizure hearing held October 26, 1987, the Court denied Advance's motion for immediate release of the vessel without bond, fixed security for the release at $175,000, fixed countersecurity at $100,000 and referred the parties to arbitration in London. The present Order & Reasons gives the reasons for these rulings.

The plaintiff, E.A.S.T., Inc. of Stamford, Connecticut (E.A.S.T.), argues that it had time chartered Advance's vessel, the M/V ALAIA, that Advance breached its warranty of seaworthiness and that E.A.S.T. is thus entitled to a maritime lien on the vessel. Advance naturally disagrees; it argues that the charter party either was never executed by Advance or was still executory at the time of the alleged breach and that no maritime lien was thus created. Because the Court believes Advance entered into a charter that was no longer executory at the time E.A.S.T. rejected the vessel for the alleged breach, the Court finds for the purpose of the preliminary, post-seizure hearing that the limited evidence brought out at the hearing supports E.A.S.T.'s claim for a maritime lien.

## I.

On Wednesday afternoon, October 21, 1987, E.A.S.T. filed a verified complaint against the M/V ALAIA in rem and posted a $250 cost bond. Upon reviewing the complaint pursuant to Local Rule 32.1 and Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the Court ordered the Clerk to issue a warrant for arrest of the vessel. That evening, a U.S. deputy marshal arrested the vessel at the Nashville Avenue Wharf in New Orleans. Two days later, late Friday afternoon, Advance filed a notice of appearance in personam, an answer and a counterclaim, moved for an expedited post-seizure hearing and informally requested that the hearing be on Monday morning, October 26, 1987. To ensure due process of law, the Court granted the motion, and the hearing was held as and when requested.

At the hearing, E.A.S.T. called one witness: Robert Dammers, its president. According to Mr. Dammers, E.A.S.T. through its broker Estero in Rotterdam and Advance through its broker Matheson in London agreed to the main terms of a time charter on Friday, October 16, 1987 and agreed to the remaining details the next morning. Exhibit Dammers 3 (master's copy of the time charter);[1] see Tr. 28:21–29:9, 33:11–:17. The next business day, Monday, October 19, E.A.S.T.'s broker sent a fixture recap of all the negotiations. Exhibit Dammers 4 (E.A.S.T.'s FAX copy of the recap sent by Estero to Matheson);[2] see Tr. 29:5–:17, 30:13–31:6, 43:4–:15. Neither side sent further responses to the recap. Tr. 29:16–:17. According to Mr. Dammers, it is routine practice in the shipping industry to send such a recap, to be treated as the parties' final agreement. See Tr. 29:10–:15, 30:20–:21.

The fixture recap changes the place of arbitration from New York to London and states that English law shall govern the

---

1. The charter follows the standard New York Produce Exchange form of 1946 (often referred to as NYPE46), *reprinted in* G. Gilmore & C. Black, *The Law of Admiralty* app. B, at 1003–10 (2d ed. 1975). For the most recent, standard 1981 form, see N. Healy & D. Sharpe, *Admiralty: Cases and Materials* app., at 823–31 (2d ed. 1986).

 The exhibit bears no signatures; while E.A.S.T.'s and Estero's stamps appear on the exhibit, no stamp or insignia of Advance or Matheson appears. Counsel for Advance had no objection to this exhibit. Tr. 25:7–:10.

2. For authorities confirming and further explaining this general trade custom, see *Great*

*Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121 (2d Cir.1982); M. Wilford, T. Coghlin, N. Healy Jr. & J. Kimball, *Time Charters* 7–9 (2d ed. 1982) [hereinafter Wilford]. *Cf.* U.C.C. § 2–207(1) ("A ... written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon ...").

 Counsel for Advance objected to this exhibit on the grounds that Advance had never signed or confirmed this recap. *See* Tr. 28:3–:7, 31:4–32:23.

contract. *Compare* Exhibit Dammers 4, cl. 67 *with* Exhibit Dammers 3, cl. 17 (New York arbitration clause deleted). In its answer, Advance admits that the charter calls for arbitration in London.

On October 16, almost simultaneously with the fixture between E.A.S.T. and Advance, E.A.S.T. entered into two voyage subcharters for the vessel to carry cargoes to Puerto Cabello, Venezuela—one cargo of milk stock cartons and woodpulp to ship from New Orleans, *see* Exhibit Advance 3, and one cargo of soda ash to ship from Port Arthur, Texas.

Mr. Dammers testified that E.A.S.T. paid Advance $26,700 as advance hire, paid $15,000 for port and agency charges in New Orleans, *see* Exhibit Dammers 1, ordered bunkers for the vessel, *see* Exhibit Dammers 5, and through its New Orleans agent instructed the master of the vessel to bring the vessel to New Orleans to load the milk stock and woodpulp cargo first. Upon its arrival in New Orleans on October 20,[3] the vessel was surveyed by Ronald Campana, an independent marine surveyor.[4] His report of October 21 states that the vessel was unsuitable for the intended cargo. *See* Exhibit 1 to E.A.S.T.'s Memorandum in Opposition. Because of this report, neither cargo was loaded on the vessel and E.A.S.T. rejected the vessel. Later that day, E.A.S.T. filed this complaint, and the vessel was arrested; that Friday, Advance filed a counterclaim alleging E.A.S.T.'s wrongful rejection.

E.A.S.T. chartered another vessel to ship the soda ash, but the subcharterer for the New Orleans cargo canceled its subcharter on October 23; according to Mr. Dammers, E.A.S.T. attempted, but was unable to find another subcharterer for the ALAIA. Tr. 47:12–48:4.

## II.

The Court's role at this point in this matter is most limited. Especially with the arbitration provision in the charter, the Court is not attempting to resolve the merits of the parties' dispute; it is only determining whether the arrest was proper, specifically, whether the evidence brought out at the hearing supports a prima facie claim of a maritime lien on the vessel. *See Amstar Corp. v. S/S Alexandros T.,* 664 F.2d 904, 912 (4th Cir.1981). In determining such, the Court must conclude (1) whether based on the evidence from the hearing, Advance may deny the existence of the charter between E.A.S.T. and it and (2) if not, whether the charter falls within the executory contract doctrine of *The Schooner Freeman v. Buckingham,* 59 U.S. (18 How.) 182, 15 L.Ed. 341 (1855), and its progeny so as to deprive E.A.S.T. of its right to assert a maritime lien.

### A.

Advance points to the absence of its authorized signature on E.A.S.T.'s exhibits of the original charter and the fixture recap and argues that without such a signature Advance cannot be bound to the charter.[5] The argument fails.

▮ A charter party, such as the New York Produce Exchange time charter involved here, is merely a form of contract and is generally subject to the rules and principles of construction for ordinary commercial contracts. *See Marine Overseas Services, Inc. v. Crossocean Shipping Co.,* 791 F.2d 1227, 1234 (5th Cir.1986). A charter comes into existence when the parties have a meeting of the minds on the essential terms of the charter. *E.g., Interocean Shipping Co. v. National Shipping & Trading Corp.,* 523 F.2d 527, 534 (2d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). A charter does not have to be signed to be legally binding. *A/S Custodia v. Lessin International,*

---

**3.** The charter provided for lay time to begin "20th OCTOBER 1987—00.01 HOURS." Exhibit Dammers 3, cl. 14; *see* Tr. 30:2–:3.

**4.** Mr. Campana was present at the hearing, but neither party called him as a witness.

**5.** Although counsel for Advance did not expressly object to Exhibit Dammers 3, the original working copy of the charter, *see supra* note 1, the Court presumes that he objects to this exhibit on the same grounds as he does for Exhibit Dammers 4, the recap, *see supra* note 2.

*Inc.*, 503 F.2d 318, 320 (2d Cir.1974); *see Valero Refining, Inc. v. M/T Laubenhorn*, 813 F.2d 60, 64 (5th Cir.1987). Indeed, even an oral charter is valid and enforceable. *E.g., St. Paul Fire & Marine Insurance Co. v. Vest Transportation Co.*, 666 F.2d 932, 939 (5th Cir.1982); *accord* Wilford, *supra* note 3, at 1 (on English law); *see Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

▮ Mr. Dammers testified that both sides agreed to the essential terms of the charter and that the general shipping custom on fixture recaps did not require written confirmations to make these recaps binding. Advance offered no opposing testimony. Thus, based solely on the evidence presented so far, the Court finds that Advance is bound by the charter.[6]

▮ Besides, Advance is barred by the doctrine of promissory estoppel from denying the existence of a binding and enforceable charter party. In reliance on Advance's agreement to charter the ALAIA to E.A.S.T., E.A.S.T. subchartered the vessel to a third party for the carriage of two cargoes, ordered bunkers for the vessel, appointed a local agent and paid port and agency charges for the vessel to enter the New Orleans port. Upon E.A.S.T.'s instructions to the vessel's master, Advance directed the vessel to sail to New Orleans; Advance had the vessel tender notice of readiness under the time charter with E.A.S.T. after its arrival and, in reliance on E.A.S.T.'s contractual obligation to appoint an agent in the port and to pay port charges, refrained from appointing its own agent and from paying any port charges. In sum, because E.A.S.T. relied to its detriment on Advance's own conduct, Advance is estopped from denying the existence of the time charter with E.A.S.T.

▮ In passing, Advance argues that commencement of the charter was condi-

tioned on E.A.S.T.'s acceptance of the vessel. This argument must likewise fail. Not only does the charter not expressly state such a condition, but also it expressly states a specific time when the charter is to commence, *see supra* note 3. Binding authority squarely rejects Advance's argument. *See Eastern Marine Corp. v. Fukaya Trading Co.*, 364 F.2d 80, 84 (5th Cir.) (concerning an NYPE46 time charter) ("the court will presume the formation of a contract upon execution of the document if all other standard contractual requirements, such as consideration and capacity, have been satisfied"), *cert. denied*, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966).

## B.

▮ The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (1982), does not of itself create any independent federal jurisdiction. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983); *see also* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3569, at 170–72 (2d ed. 1984). Specifically with respect to maritime actions, section 8 of the Act, 9 U.S.C. § 8, does not of itself confer an *in rem* right against a vessel. *Metropolitan World Tanker, Corp. v. P.N. Pertambangan Minjakdangas Bumi Nasional*, 427 F.Supp. 2, 3–4 (S.D.N.Y.1975). To proceed *in rem* under section 8 of the Act, there must exist an independent *in rem* admiralty claim. *Id.* at 4.

Both parties agree that U.S. law governs whether a maritime lien exists in this matter. They simply disagree on what the law is or should be.

It is axiomatic that "a maritime lien is the necessary basis for every admiralty proceeding *in rem*."[7] 2 *Benedict on Ad-*

---

6. The rule in *A/S Custodia* and *Valero* fully addresses and rejects Advance's objections to Exhibits Dammers 3–4, *see supra* notes 2 & 5. Even considering these objections, however, Advance would still be bound by the charter in light of Mr. Dammers' oral testimony on a meeting of the minds.

7. Claims that are otherwise maritime in nature, but that do not give rise to a maritime lien must be pursued *in personam. E.g., Interocean Shipping Co. v. M/V Lygaria*, 512 F.Supp. 960, 963 (D.Md.1981) (citing *The Resolute*, 168 U.S. 437, 440, 18 S.Ct. 112, 113, 42 L.Ed. 533 (1897); *The Rock Island Bridge*, 73 U.S. (6 Wall.) 213, 215, 18 L.Ed. 753 (1867)). Curiously, E.A.S.T. did not

*miralty* § 21, at 2–4 (7th ed. 1986). As the Second Circuit stated in a case concerning a similar NYPE time charter: "The American law is clear that there is a maritime lien for the breach of a charter party, and because the damages sought to be recovered by [the time charterer] are all of a maritime nature and flow directly from the breach of the charter, it has a maritime lien." *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1027 (2d Cir.1973) (footnotes omitted); *see also* G. Gilmore & C. Black, *supra* note 1, at 631.

In a case cited by neither party, the Fifth Circuit has held that an owner's breach of a charter creates a maritime lien in favor of the charterer. *International Marine Towing, Inc. v. Southern Leasing Partners*, 722 F.2d 126, 130–33 (5th Cir.1983), *cert. denied sub nom. First Mississippi National Bank v. International Marine Towing, Inc.*, 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984). In that case, which concerned a bareboat charter, the panel cited *Rainbow* with full approval and specifically noted that the rationale of *Rainbow* applied equally to time charters and bareboat charters. *See id.* at 130–31.

Advance does not appear to dispute the general statement that the breach of a charter party creates a lien in certain cases. Rather, Advance argues that the instant time charter party was still executory and that E.A.S.T. has no lien in this case because no lien arises for breach of an executory contract.

A brief history of the executory contract doctrine first announced in *The Schooner Freeman v. Buckingham*, 59 U.S. (18 How.) 182, 15 L.Ed. 341 (1855), is in order. In that case, the Supreme Court reversed the trial court to hold that consignees of bills of lading were not entitled to assert a maritime lien against a vessel where the master of the vessel fraudulently represented that the cargo was shipped aboard the vessel. The Court stated in dictum:

[C]harterparties, must, in the invariable regular course of ... business, be made,

for the performance of which the law confers a lien on the vessel.

*Id.* 59 U.S. (18 How.) at 190. It further stated in dictum:

[T]he law creates no lien on a vessel ... until some lawful contract of affreightment is made, and a cargo is shipped under it.

*Id.* at 188.

From that case and the half-dozen other Supreme Court cases that have followed comes the general proposition that a cargo owner or a holder of a bill of lading may not assert a lien against a vessel for mere failure to duly ship the cargo if the cargo has never been shipped or loaded aboard the vessel or delivered to the custody or control of the owner or master of the vessel. *See id.* at 187–88; *Vandewater v. Mills (The Yankee Blade)*, 60 U.S. (19 How.) 82, 91–92, 15 L.Ed. 554 (1856) (no lien where the vessel owner refused to employ his vessel under a contract, which the Court found was not a charter party or even a maritime contract); *Bulkley v. Naumkeag Steam Cotton Co. (The Edwin)*, 65 U.S. (24 How.) 386, 392–94, 16 L.Ed. 599 (1860) (holders of bills of lading entitled to a lien for damaged cargo where the cargo had passed into the custody and control of the vessel's master, even though the cargo was itself never aboard the vessel); *The Lady Franklin*, 75 U.S. (8 Wall.) 325, 328–29, 19 L.Ed. 455 (1868) (holders of a bill of lading not entitled to a lien where the cargo was never delivered to or shipped aboard the seized vessel, but rather was shipped aboard another person's vessel); *The Keokuk*, 76 U.S. (9 Wall.) 517, 519–21, 19 L.Ed. 744 (1869) (cargo owner not entitled to a lien where there was no contract for the vessel to carry the cargo and the cargo was never in the custody of the master of the vessel); *Osaka Shosen Kaisha v. Pacific Export Lumber Co.*, 260 U.S. 490, 495–956, 43 S.Ct. 172, 172–73, 67 L.Ed. 364 (1923) (vessel charterer not entitled to a lien for captain's refusal to accept certain, excess cargo for shipment, where

name Advance as a defendant *in personam.* The Court expressly finds that such was, in any

event, unnecessary. *See infra* p. 804.

the cargo that was accepted was duly shipped); *Krauss Brothers Lumber Co. v. Dimon Steamship Corp.*, 290 U.S. 117, 122–25, 54 S.Ct. 105, 106–07, 78 L.Ed. 216 (1933) (holder of a bill of lading entitled to a lien on the vessel for mistaken overpayment of freight where the cargo was duly shipped).

 The vast majority of cases addressing the executory contract doctrine have concerned contracts of affreightment evidenced by bills of lading and/or voyage charters; hardly any have concerned bareboat or time charters. *See* G. Gilmore & C. Black, *supra* note 1, at 635; *see also International Marine Towing*, 722 F.2d at 130 n. 7. But Advance ignores this important distinction between these two categories of shipping contracts in contending that under the executory contract doctrine a maritime lien for breach of a time charter party arises only if cargo was loaded aboard.[8] Though perhaps generally valid in the context of bills of lading or voyage charters, which were at issue in many of the cases cited by Advance,[9] the proposition does not apply in the context of time charters, such as the NYPE46 form at issue here. Nor has any Supreme Court or circuit case this Court has found suggested otherwise. The seven Supreme Court cases above only concern liens from the "union of cargo and vessel," *see* Cleirac, *Us et Coutumes de la Mer* 597 (1647) ("Le batel est obligé à la marchandise et la marchandise au batel."); they do not purport to address the whole array of other maritime liens, such as the lien for a charterer's providing supplies to

a vessel or the lien for breach of a contract that is not a "cargo contract."

Some of the distinctions between the two forms of charters are explained in *Scrutton on Charterparties and Bills of Lading* 51 (19th ed. 1984) as follows:

> Charterparties not by way of demise fall into two main categories: (1) time charters and (2) voyage charters.
>
> Under the ordinary form of time charter, the shipowner agrees with the time charterer to render services for a named period by his master and crew to carry goods put on board his ship by or on behalf of the time charterer. The shipowner's remuneration is usually termed "hire" and is generally calculated at a monthly rate on the tonnage of the ship.
>
> A voyage charter differs from a time charter in many respects, but primarily in that it is a contract to carry specified goods on a defined voyage or voyages, the remuneration of the shipowner being a freight calculated according to the quantity of cargo loaded or carried, or sometimes lump sum freight. (footnotes omitted)

*See also* O'Brien, *Freight and Hire*, 49 Tulane L.Rev. 956 (1975). Other significant differences exist as well. Under a time charter, the charterer generally provides and pays for all fuel, port charges, pilotage, launch hire, tug assistance, consular charges, dock, harbor and tonnage dues at the ports of delivery and redelivery and agency fees; whereas under a voyage charter, the owner generally absorbs all operating expenses, such as port charges, cost of

---

**8.** Advance mischaracterizes the doctrine even for cargo liens in the bill of lading context. Cargo need not be shipped or even loaded aboard the vessel. *Bulkley*, 65 U.S. (24 How.) at 393. Rather, the cargo must be in the custody or control of the vessel owner or master. *Id.* at 392, 394. Because the foregoing rule does not apply here, the Court need not decide whether E.A.S.T. would nonetheless have satisfied this custody/control test by having the cargo ready to load.

**9.** *See Osaka Shosen*, 260 U.S. 490, 43 S.Ct. 172; *Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461 (5th Cir.1984); *Belvedere v. Compania Plomari de Vapores, S.A.*, 189 F.2d 148 (5th Cir.1951).

Because the Fifth Circuit binds this Court, certain dictum in *Rainbow* must be addressed. *See Rainbow*, 480 F.2d 1027 n. 6 ("although it would not matter in this case, we disagree with the court in Belvedere ... to the extent that it felt that a time charter was executory until the first cargo was loaded."). *Belvedere* did not mention *time* charters at all, and thus there can be no actual disagreement. The sole point the Second Circuit was making was that it would not extend *Belvedere* by analogy to apply to time charters. The Fifth Circuit has all but explicitly endorsed the Second Circuit's refusal to extend *Belvedere*. *See International Marine Towing*, 722 F.2d at 131 n. 8.

bunkers, loading and discharging expenses and agency fees. *E.g.*, 1 J. Bes, *Chartering and Shipping Terms* 69–71, 76–77 (10th ed. 1977). Thus, under a time charter, the time charterer begins his performance—well before cargo is, if ever, loaded on the vessel—by paying hire, appointing and funding a port agent, and arranging and paying for pilotage, tug assistance and line handlers and all else necessary to berth the vessel in order to load cargo; under a voyage charter, on the other hand, since the owner pays these operating expenses, the voyage charterer's performance does not begin until control of the cargo is transfered to the vessel owner. While a time charterer pays hire in advance for the use of the vessel, the voyage charterer does not pay until after cargo has been loaded and bills of lading signed or, in some cases, even later.

Before the vessel was arrested on October 21, 1987, E.A.S.T. had paid time charter hire, had appointed an agent to handle the vessel's needs in the Port of New Orleans, had forwarded $15,000 to the agent for payment of all port charges and had the New Orleans cargo on the dock ready for shipment. Under the terms of the charter, the vessel was delivered to E.A.S.T. when it arrived at the pilot station below New Orleans. *See* Exhibit Dammers 3, line 18. Through its agent, E.A.S.T. provided a pilot to bring the vessel upriver, tugs to maneuver it into berth at the Nashville Avenue Wharf and line handlers to make the vessel "all fast." There is no doubt that the vessel was delivered under the charter and that E.A.S.T. and Advance had commenced performance. In sum, the charter was not executory at the time of the arrest, and thus E.A.S.T. may properly assert a maritime lien for the alleged breach.

The principal case relied upon by Advance for the argument that E.A.S.T. has no maritime lien is *Interocean Shipping v. M/V Lygaria,* 512 F.Supp. 960 (D.Md. 1981). There, the court held that the time charterer was not entitled to assert a maritime lien against the vessel for loss of future profits from breach of the charter. Despite its lengthy discussion, the court appears to have overstated the doctrine of

executory contracts by improperly considering both time and voyage charters as contracts of affreightment, that is, by erroneously presuming that the doctrine applies to time charterers under the same conditions as it does to mere cargo owners. *See id.* at 964. For the same reason, the Court does not find the dictum in *European–American Banking Corp. v. M/S Rosaria,* 486 F.Supp. 245, 255 (S.D.Miss.1978 & 1979) (cargo must be loaded before a time charterer may assert a lien) to be persuasive. The Court agrees with these two cases, however, to the extent they hold that a charterer may not assert a lien for loss of future, speculative profits from subcharters not yet entered into. *See id.* at 271; *Interocean Shipping,* 512 F.Supp. at 966–68.

A voyage charter may constitute a contract of affreightment. *See, e.g., The Gracie D. Chambers,* 253 F. 182, 183 (2d Cir.1918) (characterizing the payment to owner under a voyage charter as "freight," which is earned only upon delivery of cargo at destination), *affirmed sub nom. International Paper Co. v. The Gracie D. Chambers,* 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318 (1919). But a time charter should not be considered a contract of affreightment, for charter hire in a time charter is based on the period of the charter regardless of cargo carried. This basic distinction is discussed at length in O'Brien, *supra,* 49 Tulane L.Rev. 956. *Cf., e.g., Clyde Commercial Steamship Co. v. West India Steamship Co.,* 169 F. 275 (2d Cir.) (no off-hire for a time charterer where the vessel was quarantined at a Texas harbor, for the charterer had the use of the vessel during the quarantine and could have sent the vessel elsewhere), *cert. denied,* 214 U.S. 523, 29 S.Ct. 702, 53 L.Ed. 1067 (1909).

The requirement that a vessel take control over cargo before a charterer may assert a lien under a voyage charter is reasonable in light of the nature of the obligations of the parties: the owner is obliged to provide a vessel for carriage of a cargo to a destination, and the charterer is obliged to pay freight to the owner for

delivery. With a time charter as in this case, it makes no sense to determine that the charter is executory until the loading of cargo. The charter itself provides a *time* when it commences. After that time, the charterer is responsible for charges as described above.

■■■ Simply put in sum, a maritime lien may arise for breach of a time charter once the vessel is placed at the charterer's disposal. *Rainbow*, 480 F.2d at 1027 n. 6; *see International Marine Towing*, 722 F.2d at 131 n. 8 ("Delivery of the vessel commences the performance of a time charter and removes it from executory status."); *see also* G. Gilmore & C. Black, *supra* note 1, at 636. Because Advance had placed the ALAIA at E.A.S.T.'s disposal and lay time under the charter had begun, E.A.S.T. may properly assert a maritime lien for Advance's subsequent alleged breach of the charter.

Without the security obtainable through such a lien, the rights of a time charterer would often be very hollow, especially (as E.A.S.T. suggests here) if the vessel owner is a foreign, single-vessel corporation. The possibility of such a lien is commercially useful, for it provides a modicum of stability to, or assurance against, the transience of maritime affairs. *See generally Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 404 (5th Cir.1987).

### III.

In concluding, the Court addresses a few peripheral matters on the amount of security and on arbitration.

The significant portion of the post-seizure hearing consisted of testimony and argument over the amount the Court should fix for security and countersecurity. *See* Supp.F.R.Civ.P. E(5)(a), E(7). Having considered the law and the evidence on both sides, the Court determined the following principal sums to be sufficient to fully cover the amount of each side's claims fairly stated: $175,000 for E.A.S.T.'s claims against the vessel, and $100,000 for Advance's counterclaims against E.A.S.T.

■■■ Advance argues, with no citation of authority, that E.A.S.T.'s complaint is procedurally defective since it names only the vessel *in rem* as a defendant and does not include an *in personam* claim against Advance; specifically, Advance argues that it may not be ordered to arbitration without being named a defendant *in personam*. Section 8 of the Federal Arbitration Act, 9 U.S.C. § 8, does not require the party seeking security for the claim to be arbitrated to name as a defendant the owner of the vessel to be seized as security; instead, this section permits the plaintiff to proceed "according to the usual course of admiralty proceedings," which include an action wholly *in rem* under Rule C. At least once, the Fifth Circuit has held that a court retained jurisdiction to refer parties in a time charter dispute to arbitration where the charterer apparently joined solely the vessel *in rem*. *See Industrial y Frutera Colombiana, S.A. v. The Brisk*, 195 F.2d 1015 (5th Cir.1952). To hold otherwise would make too much of the fiction of personification in *in rem* proceedings and would hail form over substance. In any event, Advance itself has cured the alleged defect by appearing in this action *in personam*, not just as owner and claimant of the vessel, but on its own behalf without qualification as counterclaimant. Thus, Advance is fully before this Court and may properly be referred to arbitration under 9 U.S.C. § 8.

Having determined that the arrest was proper and having fixed the security and countersecurity, the Court referred the parties to arbitration in London pursuant to the written charter. *See Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 63–64 (5th Cir.1987) (affirming an order to arbitrate where the written charter party was neither signed nor dated but where the parties had been found to have agreed to the charter). Because the Court determined the dispute "is referable to arbitration, ... the court may not delve further into the dispute." *City of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 528 (5th Cir.1983). Specifically, the Court may not decide the merits of the dispute. It is for the London arbitrators to determine

whether Advance or E.A.S.T. actually breached the charter and if so, what amount of damages is due to whom; it is for them to determine whether the prima facie showing at the post-seizure hearing represents the entire merits.

██ Advance has asked the Court to direct arbitration to commence within 14 days of the hearing. Counsel for Advance has been unable to offer, and the Court has been unable to find, any authority for the request. Because the Court believes it does not have the power to dictate how and when arbitrators beyond its jurisdictional reach must proceed, the Court denied the request. The Court notes, however, that neither side has an interest in delay. Because each side on the one hand is seeking money damages and on the other hand has already posted security to cover the other's claims against it, both sides have sufficient incentive to have the arbitration completed as expeditiously as possible.

### IV.

For those who may have found the foregoing a soporiphic dissertation, the Court summarizes the two main points of law discussed. First, a vessel owner may not deny the existence of a time charter merely because his signature does not appear on the written charter agreement, especially where he has already placed the vessel at the charterer's disposal and both have already begun performance under the charter. Second, once this performance has begun even if no cargo is ever loaded on the vessel, the charterer may assert a maritime lien on the vessel for breach of the warranty of seaworthiness to recover both the money already spent on the vessel and any contract damages.