SEA–LAND SERVICE, INC., Plaintiff,

v.

Pedro SELLAN, Defendant.

No. 98–1311–CIV.

United States District Court, S.D. Florida.

July 16, 1999.

David Horr, Miami, FL, Joseph Stearns, New York, NY, for Plaintiff.

J.H. Zidell, Miami Beach, FL, for Defendant.

## OPINION

JAMES LAWRENCE KING, District Judge.

This case was tried, non-jury, on June 28 and July 7, 1999. The Court makes the following findings of fact and conclusions of law.

### FINDING OF FACTS

1. Defendant, Pedro Sellan, was employed by the Seafarer's International Union as a chief steward aboard the Plaintiff's vessel, Sea–Land Expedition, on November 6, 1993. On that date, he was moving a heavy box of meat when he suddenly felt pain in his back. As a result of this injury, Pedro Sellan brought a claim against Plaintiff, Sea–Land Service, Inc. Sellan thereupon had low back surgery performed at Cedars Medical Center, Miami, Florida on June 20, 1994, by Alvero J. Jerez, M.D., a neurosurgeon.

2. Plaintiff, Sea–Land Service, Inc. paid all medical expenses as well as maintenance for Sellan's November 6, 1993 back injury. On May 12, 1995, Dr. Jerez reported to Noreen Arralde, the Sea–Land claims department employee responsible for adjusting Sellan's claim arising from his November 6, 1993 injury, that Sellan had been declared to be permanently not fit for duty on January 5, 1995, and would achieve maximum medical improvement by May 31, 1995. At that time, in Dr. Jerez's opinion, Sellan would have a permanent disability of 56% of the total body according to the Minnesota guidelines. In light of this finding, Dr. Jerez recommended that Sellan see a vocational counselor to assess his ability to do sedentary work. Based upon this determination of disability and its claimed connection to Sellan's November 6, 1993 back injury, Sea–Land Service, Inc. and Pedro Sellan discussed a settlement of Sellan's claims for damages.

3. The Release and Settlement Agreement Not to Sail or Work were the product of extensive negotiations, which all occurred in English between Plaintiff's employee Noreen Arralde and Defendant Pedro Sellan. Mr. Sellan actively conversed with Ms. Arralde regarding the terms and amount of compensation to be exchanged in the settlement of his claim for the 1993 injury. All of their conversations contemplated that both the Release and Settlement Agreement Not to Sail or Work must be fully executed for Sellan to receive the settlement check. Ms. Arralde flew to Houston, Texas in order to meet with Sellan in person and discuss the settlement. Mr. Sellan testified that he did not agree to not sail or work for Sea–Land in the future in the Houston meeting with Mrs. Arralde.

The Court does not find his testimony credible.

4. With the exception of his signature on the Settlement Agreement Not to Sail or Work, Sellan had both documents 'executed, including the signature of three individuals, his wife, a family friend and the notary, certifying Sellan both understood and accepted the terms of the agreement. Sellan sent the executed (less his signature) documents to Ms. Arralde to receive his check. Upon receipt of the documents, Sea–Land issued the settlement check to Sellan who cashed and invested the funds.

5. Sea–Land paid Sellan $364,500 in exchange for a release and the "Settlement Agreement Not to Sail or Work" dated July 27, 1995. This total sum included the amounts previously paid Defendant on monthly installments until he could recover from his operation. The Release and Settlement Agreement Not to Sail or Work stated Sellan assumed the risk that Dr. Jerez's evaluation of the extent of recovery and future ability to function was error. The settlement was entered into directly with Sellan, and as a result had no obligation to pay attorney's fees out of the $364,500 paid by Sea–Land. In exchange for this payment, Sellan gave Sea–Land a release and also agreed not to again sail or work ever again for Sea–Land. Sellan's claim would not have been settled without his agreement to this provision. In the agreement, Sellan acknowledged "that his doctors have recommended that he no longer engage in the career as merchant seaman" and for this reason he further states and acknowledges "that it is for his own benefit and safety not to seek employment and/or navigate aboard vessels owned, managed and/or operated by Sea–Land Service, Inc." This agreement by Sellan not to sail or work, as subsequent events have demonstrated, was prescient and, beyond that, was a necessary term, since without it, his November 6, 1993 injury claim would surely have been litigated and might have been tried with the result that Sellan would have owed a one-third or more fee out of anything recovered by settlement after suit or from any

subsequent favorable judgment. The provision in the agreement not to sail or work, stating "However, if for any reason, including oversight or consent, Mr. Pedro Sellan is able to re-engage in service aboard a vessel owned, managed and/or operated by Sea–Land Service . . . , then he shall do so at his own risk, and the company will bear no responsibility for an illness and/or injuries he may suffer while in service aboard any such vessel," clearly illustrated further foresight.

6. On April 14, 1997, Sellan succeeded in having himself declared fit for duty by Dr. Szczesny, either at his union's medical clinic or who was otherwise affiliated with it. Although Dr. Szczesny did declare Sellan fit for duty, he did not include any MRI films or CT Scans. The doctor relied on Sellan to accurately portray his medical history. Sellan did not tell Dr. Szczesny of Dr. Jerez's determination that Sellan should never return to work as a seaman due to his permanent disability. Sellan never told Dr. Szczesny of his permanent disability rating. Faced with Sellan's accurate medical history, Dr. Szczesny concluded Sellan was not fit for duty after his surgery.

7. In violation of the terms of settlement of his November 6, 1993 injury claim, Sellan, after being declared fit for duty, sought to re-engage his employment at the Union Hall in Brooklyn, N.Y. Sellan re-engaged his employment during the period of time in which Sea–Land was unable to perform the routine background checks, due to a contract dispute with the contractor, Marine Checks. The Union, who is obligated under its contract to furnish Sea–Land with fit seamen, dispatched Sellan to the Sea–Land Crusader. When the Union dispatches a seaman to a vessel, the seaman may pass on the job for any reason and wait for the next available assignment. However, Sellan, with full knowledge of his permanent injury and with full disclosure via the Collective Bargaining Agreement, of the duties he would be expected to perform, breached the terms of

the Settlement and boarded the Sea–Land vessel.

8. Sellan's October 31, 1997 alleged low-back injury aboard the Crusader occurred in the same or very similar circumstance as his November 6, 1993 injury.

9. Defendant's Motion for Summary Judgment and affidavit filed in support thereof, directly contradict the deposition testimony of Defendant, Pedro Sellan. Sellan's affidavit states that he did not understand the settlement agreement not to sail or work to preclude any and all future employment with Sea–Land after July 27, 1995. He also refers to his 12th grade education and lack of representation by counsel to suggest that he could not understand the terms of the settlement agreement, specifically the Settlement Agreement Not to Sail or Work.

10. Two days earlier, however, on over 20 different occasions during his deposition conducted by Sea–Land, he specifically stated he understood the terms of the Settlement Agreement Not to Sail or Work proposed by Sea–Land Service, Inc., but silently refused to sign the document because he did not "agree" with its terms.

### CONCLUSIONS OF LAW

### I. WHETHER THE SETTLEMENT AGREEMENT NOT TO SAIL OR WORK IS ENFORCEABLE.

■ Public policy strongly favors the enforcement of pretrial settlement agreements in all types of litigation. *Matter of Munford,* 97 F.3d 449 (11th Cir.1996). "A settlement is, after all, intended to resolve litigation, not proliferate or protract it." *Naumann v. Cambridge Tankers, Inc.,* 1988 AMC 1996 (E.D.Pa.1988). To foster settlements, the settling parties must have legal assurance that the other party will not pursue any further litigation.

■ The enforceability of a seaman's release and settlement agreement is governed by maritime law. *Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942). To enforce a seaman's settlement agreement, the facts

considered include: whether the agreement was entered into freely, without deception or coercion; whether the seaman fully understood his rights; whether the consideration is adequate in the circumstances and whether the seaman had adequate medical and legal advice at the time of executing the release. *Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942). Where an unrepresented seaman has negotiated directly with the settling party, as here, the seaman must fully understand the rights he is giving up in exchange for the settlement offered, in order to make an intelligent decision. *Bay State Dredging & Contracting Co. v. Porter,* 153 F.2d 827, 833 (1st Cir.1946). While the law is solicitous of seamen, it does not prevent them from entering into informed and voluntary settlements and from giving binding releases in connection therewith. *Pereira v. Boa Viagem Fishing Corp.,* 11 F.Supp.2d 151, 153 (D.Mass.1998). Although a seaman may subsequently wish he had made a different choice, second thoughts are not a reason for voiding an agreement that was proper and valid when the parties concluded it. *Pereira supra,* at 153.

■ Sellan had substantial and credible medical advice available to him during the settlement negotiations. Dr. Jerez, his treating neurosurgeon, had furnished a report on May 12, 1995 to Ms. Arralde and orally explained to Sellan that he had determined Sellan permanently not fit for duty on January 5, 1995, and expected Sellan to achieve maximum medical improvement by May 31,1995, at which time he would have a permanent disability rating of 56% of the total body according to the Minnesota Guidelines. Dr. Jerez specifically told Sellan to find other kinds of work and to not return to sea on merchant ships working as a chief steward or at any other rating. In fact, Sellan concedes he understood that the agreement not to return to work on Sea–Land vessels was in his best interest and reflected Dr. Jerez's concern that he not accept the risk of re-

injury during the usual work of a chief steward. Sellan admits Dr. Jerez's concern/fear of re-injury to Sellan's back due to his physical inability to handle the lifting loads, was realized in Sellan's re-injury in the identical manner as the original injury.

■ Originally, Sellan had retained legal counsel. However, in order to discuss the resolution of his case directly with Ms. Arralde of Sea–Land, he terminated the attorney's representation. Additionally, Sellan would have had to pay approximately ⅓ of his recovery to an attorney. By Sellan's own choice, he was unrepresented by counsel to discuss the settlement terms and amounts directly with Sea–Land. The absence of counsel does not, alone, prevent a seaman from entering an informed, voluntary and binding settlement. *Pereira v. Boa Viagem Fishing Corp.*, 11 F.Supp.2d 151, 153 (D.Mass.1998).

Noreen Arralde regularly provided Sellan with explanations and assistance during her negotiations with Sellen, including a personal meeting in Houston to discuss the terms of their agreement. All settlement discussions between Ms. Arralde and Sellan occurred in English. Sellan clearly has a very good understanding of English, has been in the United States since 1967, obtained his GED, and testified extensively at the trial of this case. The nature of Defendant's bargaining proposals indicated Sellan had a clear understanding of the rights he was giving up in exchange for the $364,500 settlement. The resulting Settlement Agreement was the product of negotiations between Ms. Arralde and Sellan, and included the fact that he would not be able to work, and promised not to attempt to return to work as a seaman for Sea–Land due to his permanent disability and risk of re-injury. The Court finds that the settlement was structured to cover his inability to return to sea for the remainder of his career and was intended to supplement the salary of any sedentary job he obtained. Instead, Sellan opted for a lump sum distribution of the settlement amount.

The evidence is clear that Sellan fully understood the legal and practical consequences of the terms of the Release and the Settlement Agreement Not to Sail or Work. Sellan repeatedly stated he understood the terms of the Settlement Agreement, but did not agree to promise to not return to work.

The Settlement Agreement Not to Sail or Work certainly passes the *Garrett* test for enforcing a seaman's release. By his own choice, Sellan entered his settlement negotiations without an attorney; he enjoyed the benefit of sound medical advice. Mr. Sellan mailed the fully executed Release and the witnessed and notarized Settlement Agreement Not to Sail or Work back to Plaintiff, with full understanding of the consequences of the agreements. Accordingly, the Release and Settlement Agreement Not to Sail or Work should be enforced as written. *Gomes v. Texaco Marine Serv.*, 1993 AMC 907, 1991 WL 497779 (M.D.Fla.1991).

**II. Oral Contracts are Enforceable Under the General Maritime Law.**

■ Sellan's silent refusal to sign the Settlement Agreement Not to Sail or Work does not render the contract unenforceable. Under the governing general maritime law principles, "it is an established rule of ancient respectability that oral contracts are generally regarded as valid." *Kossick v. United Fruit*, 365 U.S. 731, 734, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), *reh'g den.*, 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852 (1961); *Vieira v. Maher Terminals*, 1999 AMC 577 (E.D.N.Y.1998). Oral settlement agreements are enforceable "as long as there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement." *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir.1995); *Mattingly v. City of Chicago*, 897 F.Supp. 375, 377 (N.D.Ill.1995). Federal maritime law supersedes the state law statute of fraud, rendering oral contracts enforceable. *Kossick v. United Fruit*, 365 U.S. 731, 81

S.Ct. 886, 6 L.Ed.2d 56 (1961), *reh'g den.* 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852 (1961). The writing only provides evidence of the content of the agreement, and is not the agreement itself. *Vieira v. Maher, supra* at 580. Unsigned agreements are held enforceable where the parties have a meeting of the minds on the essential terms of their agreement. *E.A.S.T Inc. of Stamford, Conn. v. M/V ALAIA,* 1988 AMC 1396, 1399–1400, 673 F.Supp. 796 (E.D.La.1987) (finding an unsigned charter legally binding and enforceable under promissory estoppel principles). In construing contract, courts look to the parties' expressed intent. *Gregg v. U.S. Industries, Inc.,* 715 F.2d 1522 (11th Cir. 1983), *clarified on reh'g,* 721 F.2d 345, *cert. denied* 466 U.S. 960, 104 S.Ct. 2173, 80 L.Ed.2d 556. A party's "secret hopes and wishes count for nothing because the status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." *Laserage Tech. v. Laserage Lab.,* 972 F.2d 799, 802 (7th Cir.1992) (applying the objective theory of intent, also followed in Florida); *See Singer v. Singer,* 706 So.2d 914, 915 (Fla. 4th DCA 1998).

Similarly, here, Sellan's silent refusal to sign the Settlement Agreement Not to Sail or Work does not invalidate their oral agreement to exchange the settlement money for his promises to never again sail or work aboard a Sea–Land vessel. This was the expressed intent of the parties.

### III Sellan Ratified the Settlement Agreement Not to Sail or Work by Accepting Sea–Land's Consideration.

 Sellan's acceptance of the settlement check operates to ratify the Settlement Agreement Not to Sail or Work. Where a party accepts the benefits of a settlement agreement or a compromise of his case and knows, or in the exercise of due diligence should have known, the facts concerning that settlement, the party ratifies the settlement by accepting the benefits whether the settlement was in the first instance authorized by him, and he is thereafter estopped from attacking the settlement. *Kisz v. Massry,* 426 So.2d 1009, 1011 (Fla. 2d DCA 1983), *citing Nagymihaly v. Zipes,* 353 So.2d 943 (Fla. 3d DCA 1978). The power of avoidance is lost by ratification of the contract by acceptance of the benefits. *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 556 F.Supp. 1319, 1338 (S.D.Fla.1983). Even where the claimant does not sign the settlement agreement, an acceptance of the settlement check under the given terms operates as a ratification of the settlement agreement. *Thompson v. D.C. America, Inc.,* 951 F.Supp. 192, 196 (M.D.Ala.1996). As the Middle District of Alabama noted in *Thompson:*

> The plaintiff cannot keep the money and at the same time reject the settlement agreement: "One cannot ratify in part; cannot hold the fruits of the transaction and deny to the other the benefits accruing him..." *Id.* Accordingly, the court finds that the plaintiff's continued retention of the settlement proceeds despite her full knowledge of the terms of the settlement agreement for more than a year constitutes acquiescence to the terms thereof. [citations omitted] Because the plaintiff apparently has no intention of returning the money, the court finds that she is bound by the settlement agreement. *Thompson,* 951 F.Supp. at 196.

The evidence, by Sellan's own testimony, demonstrates he accepted the benefits of the settlement agreement without voicing his objection and thereby ratified the Agreement Not to Sail or Work. The settlement amount of $364,500 was a product of negotiation, which included factors such as Sellan's inability to return to work as a seaman, his past and future lost wages and medical expenses. An integral part of all discussions of the settlement included Sellan's promise not to sail or work aboard a Sea–Land vessel again. By all actions, except for secretly withholding his assent to the Agreement Not to Sail or Work,

Sellan represented to Sea–Land that he accepted the terms of the Release and the Settlement Agreement Not to Sail or Work. Relying upon these representations and the three witnesses including a notary who swore Sellan understood and agreed to both the Release and the Settlement Agreement Not to Sail or Work, Sea–Land paid Sellan ample consideration. Sellan seeks to keep the settlement money, and reject the terms of the agreement. Sellan's bankruptcy action demonstrates Sellan has no intention of returning the money, and he is bound by the Settlement Agreement.

**IV Sellan is Equitably Estopped from Evading the Settlement Agreement Not to Sail or Work After he Received Generous Consideration for his Promise.**

 Equitable estoppel operates to bar Sellan's second claim for future wages because Sea–Land has already paid these damages under the first settlement on the representation that Sellan could never return to work as a seaman. *See Goss v. Long Island R.Co.*, 159 F.3d 1346, 1347 (2nd Cir.1998). Where a party accepts substantial sums of money in accordance with their understanding pursuant to an agreement, but the parties do not come to a signed agreement, the parties have entered a settlement agreement by their actions. *Hunter v.Hunter*, 221 So.2d 189 (Fla. 3d DCA 1969) (holding a wife's acceptance of substantial sums in accordance with an understanding with the husband precluded her from being permitted to renege on her agreements).

 Under unjust enrichment principles, Sellan is precluded from retaining his settlement monies without honoring the Settlement Agreement Not to Sail or Work. Unjust enrichment applies where: (1) a benefit is conferred on defendant with plaintiff's knowledge of the benefit; (2) that defendant voluntarily accepted and retained such benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to plaintiff.

Here, all of the elements for unjust enrichment have been satisfied. The 1993 settlement was entirely predicated on Sellan's own representation and all the medical advice available at the time that Sellan was unable to ever resume work at sea; it was a lifetime settlement for a claimed permanent disability. Sellan submitted the signed, witnessed and notarized Release and the unsigned, witnessed and notarized Settlement Agreement Not to Sail or Work, but purposefully failed to communicate his disagreement with the terms of the agreement. Specifically, the latter aspect of it, which states by virtue of the execution of the Agreement Not to Sail or Work by three witnesses, including Sellan's wife, that he had understood the terms of the Agreement Not to Sail or Work and agreed to its terms.

During his testimony, Sellan conceded his secret, undisclosed intent to avoid agreeing to never return to work for Sea–Land, but to misrepresent his assent to the terms of the Settlement Agreement to induce Sea–Land to furnish him the $364,500.

Despite the unrefuted medical advice that Sellan never return to work as a seaman, he claims simply he would not agree to "sell his livelihood away." However, Sellan expressed himself to the contrary during the settlement negotiations in his letter to Ms. Arralde requesting her to use great care because this was his "livelihood" they were negotiating. Sellan, without further negotiation or expressing any disagreement, executed the Release and the Settlement Agreement Not to Sail or Work, without his signature, sent them to Sea–Land and waited for his $364,500 check. It was on that basis he claimed his livelihood had been lost due to injury and back surgery. He had to know that if he voiced his objections, he would not receive his check and would have to hire a lawyer to settle his claim.

Based upon his actions during settlement negotiations, his full execution of the Release and Settlement Agreement Not to Sail or Work and his submission of these documents to Sea–Land for payment, Sea–Land rightfully considered Sellan to have accepted the terms agreed upon and issued Sellan the consideration. Sellan's secret objection cannot operate to permit him to renege after he accepted the terms by cashing the $364,500 check in consideration for the negotiated terms and conditions.

Sea–Land conferred a benefit to Sellan, $364,500 in settlement monies; Sellan voluntarily accepted it; and the circumstances are such that it would be inequitable for him to retain the settlement monies without recognizing the enforceability of the Settlement Agreement Not to Sail or Work. Sellan is equitably estopped from enjoying the fruits of the Agreement, while evading its terms and obligations.

## V. Sellan Is Judicially Estopped from Seeking Damages for His Alleged 1997 Injury

■■■ The doctrine of judicial estoppel provides that a party may not gain an advantage "by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir.1996) (after plaintiff asserted she was unable to work for purposes of her disability claim, she could not later claim that age discrimination was the true cause for her not working). Judicial estoppel is intended to protect against a litigant playing fast and loose with the courts, because it is intended to protect the dignity of the judicial process. *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied,* 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991).

■■■ For the 1995 settlement negotiations, Sellan continuously asserted he had suffered a permanent, total disability and was physically incapable of working as a seaman ever again. Sellan now contends, after working again as a seaman, he reinjured his back and is further disabled. He claims an identical incident worsened his vocational status. No evidence suggests Sellan is less able to perform sedentary jobs after the 1997 incident than he was able to perform before. Sellan cannot be further disabled after suffering a total disability.

## VI The Settlement Agreement Not to Sail or Work is not Contrary to FELA.

■■■ The Federal Employers' Liability Act, 45 U.S.C.A. § 55 prohibits any contract of which the sole purpose is to enable a common carrier to exempt itself from liability. The parties' Settlement Agreement Not to Sail or Work, however, was not designed to exempt Sea–Land from its liability, but to prevent the circumstance in which Sea–Land might become liable for Sellan's re-injury of his back, as predicted by Sellan's own physician, Dr. Jerez. Dr. Jerez declared Sellan permanently not fit for duty; Sellan repeatedly claimed he was permanently disabled. The settlement agreement sought to preclude Sellan re-engaging his employment aboard a Sea–Land vessel and sustaining injury due to his known lack of fitness for the position.

■■■ Following a lifetime settlement for a purportedly permanent disability, an employer is entitled to refuse re-employment to the injured seaman. *Goss v. Long Island R. Co.,* 159 F.3d 1346, 1347 (2nd Cir.1998). In *Goss,* the employer reasonably expected the lifetime settlement and operated to relinquish the injured worker's expectation of ever returning to work for that employer. *Goss,* 159 F.3d at 1347. Sea–Land explicitly bargained for Sellan to never return to work; it was not an assumption, but an essential part of the negotiation process.

Sellan contends Paragraph 5 of the Settlement Agreement Not to Sail or Work contemplated his return to work with Sea–Land. In pertinent part, the provision reads:

However, if for any reason, including oversight or consent, Mr. Pedro Sellan is able to re-engage in service aboard a vessel owned, managed and/or operated by Sea–Land Service, Inc., and/or any of its affiliates and/or subsidiaries, he shall do so at his own risk, and the company will bear no responsibility for any illness and/or injuries he may suffer while in service aboard any such vessel.

] The heading on the agreement reads, "Settlement Agreement on Provision Not to Sail or Work." In interpreting a contract, the courts must give effect to the entire agreement and avoid any interpretation that creates an unnecessary conflict between the contract's terms. *Maccaferri Gabions, Inc. v. Dynateria Inc.,* 91 F.3d 1431, 1442–43 (11th Cir.1996). Despite the heading "Settlement Agreement on Provision Not to Sail or Work" and the common sense reading of the contract's terms, Sellan argues this provision enables him to return to work aboard a Sea–Land vessel. By logic parallel to Sellan's, any contract which contemplates a breach of the contract, thereby condones that breach. Such an interpretation does not comport with reason and destroys the mutuality of obligation. Contracts should not be interpreted in such a way as to destroy mutuality of obligation and thereby invalidate the contract. *Maccaferri Gabions, Inc. v. Dynateria Inc.,* 91 F.3d at 1443.

The Settlement Agreement Not to Sail or Work contemplates Sellan may breach the agreement and re-engage employment for Sea–Land despite his representations and his physician's determinations that he is permanently not fit for duty. By his own testimony, Sellan clearly understood and was fully aware of the determinations by his physician and the reasoning behind the Settlement Agreement Not to Sail or Work for his own safety and the safety of others at risk by his lack of fitness to properly perform his duties. Under the agreement, Sellan assumes the risk of his own breach.

Through the Seafarer's International Union, Sellan obtained employment aboard a Sea–Land vessel, in breach of the Settlement Agreement Not to Sail or Work. Sellan's breach and re-injury or exacerbation of his back injury, brought to bear the exact situation Sea–Land contracted to avoid—not its liability, but the situation in which the liability is said to arise, to wit, Sellan's return to employment despite his permanent disability. The settlement agreement does not run afoul of FELA prohibitions.

## VII. Conclusion

This court grants declaratory judgment for Plaintiff and specifically enforces the terms of the July 27, 1995 Settlement Agreement Not to Sail or Work.

DONE and ORDERED in chambers at the James Lawrence King Federal Justice Building and United States District Courthouse, Miami, Florida this 16th day of July, 1999.